All right, our last case to be argued this morning is actually three related cases, United States v. Johnson. Good morning, Your Honors. May it please the Court, Tom Monahan on behalf of Seth Johnson, the appellant in all three of the pending appeals before this Court, I begin by addressing the denial by the District Court of the motions to suppress that is one of the subjects in 20-30051. The District Court erred in denying Mr. Johnson's motion to suppress the fruits of the warrantless forensic examination of his cell phone that was conducted by Homeland Security investigations agents less than 24 hours after he was arrested, detained for considerable time in custody, and his cell phone was secured by Homeland Security investigation agents. In its order denying the motion to suppress, the District Court failed to properly conduct the balancing analysis under the Fourth Amendment established in U.S. v. Knights and Samson v. California. On the suppression issue, is it your argument that your client's cell phone was not a device for electronic communication or data storage or media? We did not make that argument, Your Honor. Are you making it here? No, Your Honor. So his cell phone is covered by the condition in his supervised release? Yes. It is our position, however, that that condition was not a clear and unambiguous condition that divested him or significantly diminished his Fourth Amendment privacy interests. In other words, because it was essentially because the ‑‑ it was ambiguous in the sense that it restricted the search authority to a U.S. probation officer rather than to the individuals. It did not extend to the entities that ‑‑ the agents who conducted the forensic examination. So our claim is that the District Court failed to apply Samson and Knights, which very much demanded that there be a clear and unambiguous condition, a search condition. And in this case, there simply wasn't. At a minimum, it has to be found, in our position, ambiguous, given that it didn't specify that agents could, from HSI or any other law enforcement agency, could conduct the search. And I would note that in a number of cases, we see that all the time in the language of search conditions, that it applies not just to a U.S. probation officer or a probation and parole officer, but it extends to any law enforcement officer. And that was simply not the case here. Didn't the release condition also expressly include the retrieval and copying of all data from his computer or other electronic devices slash media? It did, Your Honor. And that would include a cell phone? I believe that it would apply to a cell phone as an electronic device, but it's still, in our position, ambiguous for this reason. If you read the language of that monitoring condition, it still was restricted to U.S. probation. It said that the monitoring has to be conducted by a U.S. probation officer as part of the U.S. probation computer. Doesn't the record establish that the probation officer found the images before it was turned over to HSI? The record establishes that the probation officers who were present at the time of Mr. Johnson's arrest conducted a manual search. One of the probation officers actually testified at the trial, Joel Osborne, and I think it was on page 380 or 381 of the excerpt of record. He testified that he couldn't tell exactly whether it was child pornography. He said it seemed young, and I'm paraphrasing, but basically he said it seemed young and that's when he then turned it over for a forensic exam to the agents with Homeland Security who were specifically trained in recognizing child pornography. It was at that point that they determined that it was actually child pornography. So would that same argument mean that if officers, if a probation officer, sees something that seemed to be drugs, smelled like drugs, he couldn't turn it over to the lab to test it? I think it's different here because of the Fourth Amendment privacy interests, as articulated by Sampson and Knights, and the nature of the thing searched. We're talking about the cell phone, which under Riley v. California, the unanimous Supreme Court basically said is more sacred a space under the Fourth Amendment than even the home, which for decades was the most revered space under Fourth Amendment jurisprudence. So, yes, I think in that case, I just think it's apples and oranges, Your Honor. I think here acting within the parameters of the search condition, the probation officers had the right to conduct the manual search that they did, but they did not have the search condition did not extend to a forensic examination, which is even more. So the difference between manual and forensic is because they took it off-site or because they gave it to somebody else? I mean, suppose the probation officer, in fact, happens to be a whiz, and he's got a mirror, what they call mirroring a hard drive. He happens to be able to do it himself, and it's okay, but not if he takes it back to the office and has somebody else come in? Well, I think that there's still further ambiguity in this search condition, and the ambiguity is what does search mean? In Cotterman, U.S. v. Cotterman, this Court, when it came to border searches, basically said that forensic examinations are more of an intrusion on a person's Fourth Amendment privacy rights than even just a regular search, for lack of a better word, a manual search. And so based on that, I think there's also ambiguity not just in who gets to conduct the search, but also ambiguity as to what search means. In Cotterman, of course, this Court required, in the context of border searches, a heightened standard before a forensic examination can be conducted, and I think Judge McKeown referred to a forensic examination as a strip search, essentially, of the electronic device. We also have, so we've got the ambiguity as to who gets to conduct the search. We've got ambiguity as to what the search means. And for those reasons, it's our position that this case is more like Lara than it is like Sampson or Knights or some of the other decisions of this Court, such as U.S. v. Johnson, Valentino-Johnson, and U.S. v. Court, K-O-R-T-E. Those cases involved a statutory search condition that was clear and unambiguous. It applied to, it gave authority to any law enforcement officer to conduct the search, and it clearly, there was no dispute that the search condition applied and authorized the search that had been conducted. But this wasn't just your client reporting to the probation officer as a part of their regular responsibility to report, walked into the office, and the probation officer says, let me see your phone. They had other information, right?  Yes, Your Honor. However, I don't believe they had any indication that there were illicit images on this cell phone. There were ---- You've been seen in the company of underage young women? Yes, Your Honor. Consuming alcohol? Yes, Your Honor. Yes, he was. And those were allegations. I would note that they were still grade C allegations. It's our position that the government has inflated the severity of the allegations against Mr. Johnson as well as his record. He was not convicted of a serious and intimate offense, as was the case in, say, Johnson and Lara. That was an important factor. Here he was convicted of felon in possession of a firearm, which has been found by this court not to be a crime of violence, and there were no surrounding---- They did. That's true, Your Honor. But that was not ---- I would note that that was not part of the disposition when he was ultimately found to be in violation of his supervision conditions. That was not one of the conclusions or the ---- that was not one of the violations that the district court found. And he still received a fairly ---- what I would consider a fairly moderate sentence in terms of 12 months and one day. This is in comparison to Valentino Johnson, who was suspected of murder, had been, I think, arrested for murder, burglary. He was believed to be running around with a gun at the time. There was some exigency that worked in favor of finding that the search was necessary at that time. Here, I think this is an important factor. It's right after Mr. Johnson gets arrested in this case, they ---- within 24 hours, they're doing a forensic examination. There's no reason. He was in custody. The phone was secured by HSI. There's no reason they couldn't have just gotten a warrant. As, you know, the court in Riley said, that's what you normally should do. So we don't have any kind of urgency, as we did, I think, in some of the cases that have been decided by this court in the past. So I think that the ---- Do you want to move on to the issue of the prior state court suppression? Yes, Your Honor. Just a suggestion. Yes or no? As you wish. Thank you, Judge Hawkins. I appreciate that. It's our position that the district court failed to conduct the proper analysis when it comes to the 2013 search that was done by state authorities, the Twin Falls police, or I can't remember if it's the sheriffs or the police, but I believe it was the police. They searched Mr. Johnson's phone and were found to have violated the Fourth Amendment, and that was suppressed by the state court. The district court simply said, well, under Lopez-Martinez, this court ---- the district court at this point said, we can let it in. It's not suppressed in the Federal case. But for the reasons articulated in our brief, it's our position this case resembles more the Tenth Circuit's decision in Hill rather than the Ninth Circuit's decision in Lopez-Martinez. For one thing, there was collusion, maybe that's not the right word, or correspondence essentially between the state and Federal authorities. The Federal probation officer was in touch with the state authorities who had prosecuted Mr. Johnson for the new violation in state court of possessing sexually exploitative material. So I think it's fair to say that there was some perception. This is not a case where there was no concept of deterrence under the exclusionary rule of law. I don't know if I track that because the conversations between the two entities was four years after the state search that was where the suppression was granted. So how can there be any deterrence value for something that's happening years later after the misconduct? I think that's true, Judge Forrest, except that there was some correspondence between the probation officer who was aware of what was going on, because that was actually alleged. The state court crime was initially alleged as one of the violations against Mr. Johnson for violating his conditions of supervised release. It was ultimately not found by the district court because it was dismissed by the state court, but it was definitely something that I think that Mr. Officer Jorgensen was the name of the probation officer back in 2013, and he was in touch with the state authorities. So I think it's fair to say that Officer Ney, the arresting or the person who seized Mr. Johnson's phone in Twin Falls in 2013, was at least aware that his actions could impact future revocation proceedings, not just the number of times. At that time? Go ahead. At that time or years later? I think at that time, Your Honor. I think if the court looks at the record that's discussed in our briefing, I think it's clear that there was connection between Mr. Jorgensen and the state authorities. In 2013 or prior to 2013? I mean, for example, if you told me that Jorgensen had seized things in 20-aught that were later introduced in federal court in 2010, then you might have something, but the fact that they spoke later on doesn't follow. Am I missing something? I think there was. Had Jorgensen done something in the past that had been admitted in federal court? I don't want to be wrong, and so I'll be candid. I don't have that cite on the tip of my tongue, but I do believe that there was connection between Officer Jorgensen at the time in 2013, because that's why he filed it as a violation, and I believe that he was. In fact, if you look at the excerpt of the record, there are faxes. I mean, the lack of deterrence or the possibility of deterrence would flow from I did it, it was unconstitutional, but then the feds got it in, as opposed to simply I did something I thought was okay, I told the feds, and later on I lost, and then years later they want to bring it in for something different. Isn't that the sequence of what actually happened? I think the way I would characterize it, Your Honor, is that at least the state authorities knew that there was this potential for the use of this material in connection with federal criminal proceedings, maybe not the prosecution for the new crime that occurs in 2017, but rather for the ongoing contemporaneous S.R. violation proceedings. Okay. That I'll buy. And I would just simply ask the Court to look at the excerpt of the record. There are, I think, faxes going between the state authorities to Officer Jorgensen and possibly vice versa. So I think there definitely was some record that we presented as part of this appeal that showed that there was that connection. Again, I'm not 100 percent, but I'm pretty sure that's the case, and I don't want to mislead or misstate the record. I'll turn to the restitution question, Your Honors. And I think it's fair to say that there are three reasons why the district court's award of $15,300 in restitution for future costs of treatment for the minor victim in this case should be reversed. Number one, it's our position that the Dolan case, Dolan v. U.S., doesn't apply because the district court didn't make it clear that restitution would be awarded. Only, I think, like ten days before the sentencing hearing, the court actually issued its order freezing Mr. Johnson's assets and says the court can't say whether it's going to order restitution. And then if you look at the transcript of the sentencing hearing, there's no clear indication why the district court's saying I'm going to order restitution. It's just a matter of how much. And so I think it's fair to say that the question of whether restitution would be awarded at all was still up for grabs. The only place where there's any definitive indication that the court was going to order restitution occurs in the sentencing minutes. Of course, I don't believe that those are the official record of the court. Those can be created by the court clerk. And certainly there was nothing on the record indicating that that information was conveyed to Mr. Johnson. You have two uphill battles there. One, on my count, there's eight different times at the sentencing hearing that the district court references restitution, and we're going to have to come back and talk about restitution, which creates an inference. And two, restitution is mandatory for this kind of crime. Horwich. Two responses, Your Honor. First, that's true. The court does talk about restitution. But I think in context with what the court has said in its order just 10 days earlier, freezing the assets, I think what the court was saying is this is not just going to be a hearing to determine how much restitution. This is going to be a hearing where you get to tell me, Mr. Monahan, why I shouldn't impose it at all. And so I think that's the distinction there. I think if it's read in context with what the court's order just a short time beforehand said, there was no definite indication, if you look at the language in the transcript of the sentencing hearing, that, yes, restitution. I've already decided it's going to be awarded. All we're going to talk about is the amount of it. Frankly, though, I think the more compelling argument for why restitution should not have been awarded is there was no claim. There's no, you know, under 2259, 18 U.S.C., 2259, I think it's C, subsection C, there has to be some indication that the future costs are reasonably projected to be incurred. Well, the victim, the minor victim, had indicated she didn't want the treatment, and her mother approved. And so it's our position that I don't think it's appropriate for the government to keep persisting and saying, well, we know better. We know better than your mother. We know better than you. We're going to seek restitution regardless of whether you want it or not. You know, and I think there is a mechanism for the person to come back later, if there are new costs that are discovered, to reopen the matter at that time, under 2259 or 3663. I can't remember which one. But I think this could actually harm victims. You know, we actually, on cross, the government's expert, Marcia Hedrick, acknowledged that some victims don't want treatment. They want to forget. And this child was still relatively young enough that perhaps she might have forgotten. And I think it's not appropriate for the government to basically ignore the wishes of the victim and her mother, her family member, and to say we're going to get it anyway, because that could require that there could be ongoing proceedings that keep reminding the victim about the fact that, you know, that this is still out there in terms of they could be called as a witness. The defense could call the victim potentially as a witness. So I think that that could be harmful, and I think it disregards the agency of the victim and the victim's family members in saying we're going to go forward with seeking restitution whether you want it or not. And I just don't see any authority saying that. Restitution is mandatory, yes, but I think there still has to be, the government has the burden still under 2259 and 3664, I believe, of establishing the loss. They still have to prove the loss and that it's reasonably likely to be incurred in the future. And here they simply didn't do that. They simply didn't prove that there was any likelihood that this would be incurred in the future. It was totally speculative. You know, the government, I think, argued, you know, people change, maybe they want it in the future. But that's not what the statute requires. It has to be reasonably likely. And there's nothing that suggested this child was going to change her mind or that her parents would. I'll reserve the last 30 seconds if I could for rebuttal. Thank you. May it please the Court. Serena Case Hargrove on behalf of the United States. Your Honor, to jump right in, I want to explain the timeline of the search of the images. I think that was a little confusing in the discussion. Indeed, the probation officer first scrolled through this flip phone and saw the images, recognized that they were of a young person, and turned the phone over, probation turned the phone over to a Homeland Security investigator, Agent Cutler. He, too, saw those images. And at that point, he shut down the phone and put it away, and they went and got a warrant. The forensic search of the phone, which was done by Agent Thrall, was done after there was a warrant. But, indeed, the probation office had turned the phone over to Agent Cutler and had asked for help. Agent Cutler is well trained. And this is precisely the kind of thing that we want probation officers to do. There are ways of preserving forensic evidence on phones, and that metadata proved incredibly important in this case, because it showed that the defendant had taken a selfie 40 seconds before he had taken the photos, the explicit photos of the little girl. And so the probation officers did precisely the right thing in preserving that evidence and making sure that an expert had it and could preserve it. The search was entirely reasonable under the totality of the circumstances. Even the defendant acknowledged that he had very little expectation of privacy in his phone. He talked about how it had been searched regularly by probation officers previously. The defendant says this case is similar to Lara. It's simply not. And the district court made clear findings about the terms of probation on ER 174. Turning to the 2013 images, Your Honor, Lopez Martinez, which is what the district court cited at 1ER21, is much more analogous than the case on which the defense relies now and relied before the district court Hill. These were different officers. And unlike Lopez Martinez, they were even from separate sovereigns in different locations, Twin Falls is an hour and a half or so from Boise. They did cooperate. The officer certainly did. But that's fine. The searches were years apart, just as they were in Lopez Martinez. And the defendant's defense in this case, as in Lopez Martinez, really made this evidence relevant. He was arguing that he didn't have an interest and that he didn't take the photos. And the prosecutor in this case selected only four images from the 2013 child erotica. But they were purposefully selected to show that this defendant was interested in a range of ages. And that was important in this case because the earlier rape he had committed was of an older child, although still quite young. Fourteen? Fourteen. Yes, Your Honor. She was 14. Counsel, if I could take you back just for a second, because you made sort of quite a point orally here about he put the phone down as soon as he saw these things and went and got a warrant. In your brief at page four, as I read it, it says that he gave it to Homeland Security. Homeland Security imaged, mirrored the drive. Thrall observed these six images. These are the same ones that the first agent had seen. And then Thrall went and then they got a warrant, which was a little different than the sequence that seemed to get the warrant between the first agent and Thrall. Your Honor, they may well have imaged it first. I was looking while my opposing counsel was testifying just at the testimony in the transcript with Agent Thrall. But I believe that I would go with what's in the brief on that. Okay. So you stick with what's in the brief. Okay. Thank you. Yes, Your Honor. So turning briefly to restitution, defense counsel is trying to distinguish between a 90-day provision and a 90-day provision. And I'm going to use the example of Senator Dolan. It's a Ninth Circuit case. And it, too, addressed the pre-2018 version of Section 2259, which the court was applying here. And it explained that this 90-day provision is actually for the benefit of victims. It is to ensure that assets are not dissipated. And the defendant has to show actual prejudice from any delay. There has been no effort to show any such prejudice here, Your Honor. And just as he had three reasons, we do, too, for why it was very clear, it was sufficiently clear to the defendant that he would have to pay restitution. And the first is that he acknowledged that restitution was mandatory. The second is the minute order was very clear. And the third is that the eight mentions of restitution by the district court at the sentencing hearing, there were four times the court discussed it, and the court was really focused on the dissipation of funds and his concern that the defendant's sentencing memo had suggested he was dissipating funds. And that leads to a clear inference that the court was worried about having enough money left for restitution. Your Honors, if there are no further questions. Well, what do we do about, I mean, I think, maybe this is foreclosed by our precedent, but this idea of awarding restitution for something that the victim doesn't even want. That seems a little bit problematic in a case where we're dealing with a child and, you know, her desires may change over time. But what, I mean, what is your response to that? Because setting aside the precedent, again, which I think may foreclose this argument, it has some logical appeal, right? Why would we be awarding restitution for something that a victim doesn't even want? So I think it's worth considering whether the victim wants this. And the finding on the record by the district court was that the victim had attended 13 counseling sessions. The state provided counseling for the victim, and the victim attended 13 of those sessions. They had a real problem getting to the sessions. They didn't have a reliable family car. And so the expert that came in and evaluated the situation said, you know, inconsistent counseling is not ideal. It would be much better to have one intensive session, and she looked into that and what it would take. That's the bulk of the cost of restitution. It was about $12,000. And they figured out a way that then the family could be housed with her for that intensive time, and the family could receive counseling, too. And so they were really trying to work around, the expert was working around the socioeconomic issues that the victim had. But to say that she didn't want counseling when she attended 13 sessions and the district court found that is very odd. I think sometimes she said she didn't want counseling, and yet they persisted, and even with barriers, serious barriers, they still managed to make it to 13 sessions. And the district court found that at one ER 10. The board was for future counseling, correct? Correct. Which would encompass a change of mind in the interim? Absolutely. One way or the other. And if the victim decided, I want no more of this, there would be nothing there, right? Right. And there was expert testimony by Dr. Hedrick that this child did have PTSD, and that at every developmental stage, often children who have gone through experiences and traumas like this will need counseling. And so at some future developmental stage, if she had a problem and it was interfering with her life, she may very well have wanted counseling. So that money is there. It can also be signed over to the... Is the money kept in escrow in some way? I mean, besides the amount, the question of how, is it actually there to help her? Your Honor, it's my understanding it is. It's governed by the Federal Debt Collection Procedures Act, which has very detailed... But I know that a victim is allowed also to sign that restitution over to the General Victim's Compensation Fund to go to other victims. And that might be something the victim would decide to do in future, too. But to say that this victim doesn't want... I mean, first off, she was eight years old, doesn't want this counseling. And second, she did attend counseling with serious economic barriers is really not correct. Do you have any response to your co-counsel's argument about that there was... I don't want to put words in his mouth. I don't think collusion is the right word, but there was discussion in 2013 between the feds and the state law enforcement about the search that ultimately the fruits of were suppressed. Yes. Again, Your Honor, we actually want law enforcement to cooperate, and this was... They did. They spoke. I think it was partly the government in that case, in the state case, where the court ruled that the evidence was illegally discovered. The government really didn't raise much of a fight in that argument. And I think the reason for that was that they understood that we would be filing, the federal government would be filing a violation. He was on supervised release at the time. So it works both ways. I mean, the state court found that it was an illegal search, but it only considered plain view. It didn't consider any other arguments. And there's no connection between those state officers and the search and the evidence in this case. So it would be very hard to imagine how suppressing the evidence that these state officers had found way back in 2013... Other reasons to violate his supervised release. They had ample reasons to violate his supervised release, and I think he ultimately pled to two reasons unrelated to the photos. I believe the photos were part of the charge, though, but I don't think he pled to those in 2013 in the violation. You would have more of a problem if they had tried to use them or even had gotten some benefit from them at that time, wouldn't you? Well... Because that would almost be illicit silver platter. I see something, I did it wrong, but I get the feds to use it. Your argument here is that that was all dead and gone, there was no conceivable thought that they would use it five years in the future. So in that hypothetical, I would say no, in that the feds using it in 2013 for the violation, he wasn't allowed to have even photos of children. And so the plain view of children would have been sufficient for the supervised release violation. And also the government, we would have then raised additional arguments about whether it was... Not before us, but it seems to me that that is a potentially more troubling case. Right, yes. I mean, another troubling scenario could be, I don't think that this is borne out in the record in this case, but if you had a record that showed that the state officer back in 2013 really wanted to have the benefit of this information that he seized, it didn't go well in the state proceeding, and so he's communicating with federal law enforcement, you're right, people coordinate, and that's not a bad thing. And he's knocking on their door every time he has an opportunity saying, you know, here's this evidence that I got, is there any way you could use it, right? I mean, that would be problematic. But I don't think that that's this case. That is definitely not this case. And bringing it to the attention of probation at that time was entirely appropriate. I mean, he was arrested, too, and there were other reasons for that besides the images. If there are no further questions, Your Honor, the government will submit and request that this Court affirm. Thank you. Thank you. Very briefly. The parts of the excerpt of record where there was communication between the Twin Falls Police and probation are found at the sealed excerpt of record number 795. That's a fax transmittal document showing transmission of the records to Officer Jorgensen, the federal PO, and also page 800, which showed communications between the Twin Falls Police and the marshals. With respect to the record on the sequence of what happened on the 2017 seizure of the phone, the phone was seized by probation. They looked through it. They gave it to Officer Cutler or Agent Cutler. He then gave it to Agent Thrall. At that point, that's when the forensic exam occurs. And it talks about him using a UFED, a universal forensic extraction device, where he then saw the six additional, same six images. Same six. Correct. But he was able to determine at that point that they were in fact child pornography, whereas the officer who testified at the trial basically said that he could not say. He looked young, but he could not say. But at what point was the warrant sought? After Agent Thrall had done his forensic examination, what they called a preview, but it's a search with the forensic tool, that's when afterwards they went to Judge Dale, Magistrate Dale, and got the search warrant at that point. But what did they find after the search warrant? Is that when they found the metadata or the connections? Yes, Your Honor. All right. At least your adversary, the way she seemed to put it was that, yes, they extracted, mirrored is the word I use, but before they got the warrant, they really didn't see anything more than what the first agent had seen, that what I call metadata, the other material, was after the warrant. Is that your understanding? The metadata was after the warrant. That was not seen, of course, by the agent Cutler. And so that was part of what we were seeking to suppress. Finally, the last thing I'll say in closing is we do want the government to, or the law enforcement to seek warrants, to go present facts to neutral magistrates and get a warrant. Words matter, and in this case, the search condition, the government still hasn't said why they couldn't have just gone and gotten a warrant in the first place, and they have never explained what the words mean in the search condition that the district court basically had to read into the monitoring condition, basically authorization for this search. That's not a clear and unambiguous condition authorizing a search and intrusion onto Mr. Johnson's Fourth Amendment Privacy Act. Thank you, Counsel. The case of United States v. Johnson, or the three related cases, are submitted. And that concludes our argument for this morning.
judges: Boggs, HAWKINS, FORREST